Williams, Judge,
delivered the opinion of the court:
Plaintiff in this suit seeks to recover the sum of $44,-772.62, alleged to have been illegally collected by the defendant as a part of the contract price for certain timber sold by the defendant to the plaintiff.
On August 10, 1920, pursuant to act of June 25, 1910 (36 Stat. 855), the Assistant Secretary of the Interior approved a form of contract and pertinent regulations, and also a form of advertisement, for the sale of approximately 450,000,000 feet of timber located on about 67,000 acres of what was known as Calimus-Marsh Unit, Klamath Indian Reservation, Oregon. The advertisement required that sealed bids, in duplicate, be addressed to Klamath Indian School, Klamath Agency, Oregon. Each bidder was required to state in his bid the price that he would pay per M feet for yellow pine, sugar pine, incense cedar, and for other kinds of timber cut and scaled prior to April 1, 1924. The advertisement stated that the prices, subsequent to April 1, 1924, were to be fixed by the Commissioner of .Indian, Affairs, for three-year periods.
On October 26, 1920, Williamson River Logging Company, in response to the invitation for bids, made its proposal, addressed to the Superintendent, Klamath Indian, School, Klamath Agency, Oregon, for the purchase of yellow pine, sugar pine, and incense cedar at $5.08 per M feet; and for all other species at $1.85 per M feet. On October 30,1920, a contract was signed by Williamson River Logging Company. On July 25, 1922, it was approved by the Assistant Secretary of the Interior.
On March 19, 1925, Modoc Pine Company acquired the contract by assignment from Williamson River Logging-Company. On April 3,1925, this assignment was approved by the Superintendent of the Klamath Agency, Klamath, Oregon, and on April 22, 1925, by the Assistant Secretary) of the Interior.
On August 10, 1926, plaintiff acquired the contract by assignment from the Modoc Pine Company. This assign *219 ment was approved by the Superintendent of the Klamath Agency, Klamath Falls, Oregon, on December 27, 1926, and by the Assistant Secretary of the Interior on January 14, 1927.
The contract provided that the timber covered in the» contract should be cut and removed by the purchaser prior to March 31, 1939, and that the purchaser should pay for such timber its value as specified in the contract, as follows:
(a) For the period ending March 31, 1924, five dollars and eight cents for yellow pine (including so-called “bull pine”), sugar pine, and incense cedar; and one dollar and eighty-five cents for other species.
(b) For each of the three year periods of the contract term beginning April 1st in the years 1924, 1927, 1930, 1933, and 1936, such prices for each species as shall be fixed by the Commissioner of Indian Affairs in the manner hereinafter described.
The contract provides the precise method for an adjustment by the Commissioner of Indian Affairs of the stump-age rates to be paid by plaintiff for the three-year period beginning April 1, 1924, and also for each of the three-year periods of the contract beginning April 1, 1927, 1930, 1933, and 1936, as follows:
For purposes of stumpage price adjustments by the Commissioner of Indian Affairs at the close of the first pei’iod of the contract as specified above, it is hereby stipulated by the superintendent and the purchaser that the average mill run wholesale net value per thousand feet lumber measurement f. o. b. mills in Southern Oregon and Northern California, during the three years ending January 1, 1920, have been twenty-two dollars and fifty cents ($22.50) for yellow pine (including so-called “bull pine”), sugar pine, and incense cedar, and seventeen dollars ($17.00) for other species.
In determining the stumpage rates to be designated for all timber scaled during the three-year period beginning April 1, 1924, the average mill run wholesale net values of lumber f. o. b. mills operating in Southern Oregon and Northern California during the three years directly preceding January 1, 1924, will be compared with the values of twenty-two dollars and fifty cents ($22.50) and seventeen dollars ($17.00) stipulated in the preceding paragraph as basic values, and *220 tbe cost of logging operations and lumber manufacture during tbe said three years will be compared with the cost of such operations and manufacture during the three-year period preceding January 1, 1920, for the purpose of ascertaining, so far as is practicable, whether there has been generally in the lumber industry in the specified region an increase in the margin of profit on logging and manufacturing operations .during the three-year period directly preceding January 1, 1924.
The first period for which the Commissioner of Indian Affairs could increase stumpage rates provided in the contract was for the three-year period beginning April 1, 1924. However, he made no increase in stumpage rates for that period and notified plaintiff’s predecessor to that effect on February 25, 1924. The next three-year period for which an increase could be made, if the facts warranted it, was that beginning April 1, 1927. The Commissioner on February 25, 1927, notified plaintiff that stumpage prices provided in the contract would be increased $1.00 per M feet to become effective April 1, 1928. The plaintiff upon the receipt of this notice immediately wrote the Commissioner of Indian Affairs protesting against the increase, saying that on the basis of the then stumpage price of $5.08 per M feet it had lost $1.02 per M feet for the year 1926, and that there was nothing in the then market situation to justify the increase. This protest was renewed on January 19, 1928, by telegram, in which plaintiff pointed out in great detail its reasons for protesting the increase and requested that it be given a hearing. Following this telegram there was considerable correspondence between the plaintiff and the Commissioner respecting the general conditions, and the quality and quantity of timber cut and to be cut. On March 24, 1928, the Commissioner informed the plaintiff by telegram that the increase of $1.00 per M feet would be reduced to 40 cents per M feet effective April 1, 1928. The increased price went into effect April 1, 1928, and remained in effect to March 31, 1930, during which period plaintiff cut 111,931,560 feet of yellow and sugar pines. That quantity at the increased rate of 40 cents per M feet amounts to $44,772.62, the amount involved in suit.
*221 The authority of the Commissioner of Indian Affairs to make an increase of 40 cents per M feet in the stumpage rates during the period April 1, 1928, to March 31, 1930, constitutes the sole issue in the case. The relevant, facts bearing on this issue, while apparently somewhat complicated, are in fact quite simple. Although, in the language of the contract, “the determination of the new rates shall lie wholly within the discretion of the Commissioner of Indian Affairs,” the contract places an important limitation on Iris discretionary power to increase stumpage prices by the provision:
Any advance in stumpage prices prescribed by the Commissioner for the three-year period beginning April 1, 1924, shall not exceed fifty per cent of the difference between the average mill run wholesale net value of lumber of that species f. o. b. mills as stipulated above and that for the same species during the three years directly preceding January 1, 1924.
The limitation on the authority of the Commissioner to make advance in stumpage rates for the three-year period beginning April 1,1924, is likewise applicable to each of the subsequent three-year periods of the contract by the following provision:
For the three-year periods of the contract beginning April 1, 1927, 1930, 1933, and 1936, re-adjustment of stumpage prices may be made in the same manner as for the period beginning April 1, 1924, except that the prices determined and used for the preceding three-year period will in each case be considered as the stipulated prices that are to be compared with the average prices obtaining during the succeeding three-year period.
While the Commissioner in determining the stumpage rates to be designated for timber cut during the three-year period beginning April 1,1927, was required by the contract to compare the cost of logging operations and lumber manufacture during the three-year period preceding April 1, 1927 with the three-year period preceding April 1, 1924, for the purpose “of ascertaining, so far as is practicable, whether there has been generally in the lumber industry in the specified region an increase in the margin of profit on *222 logging and manufacture operations” during the three-year period directly preceding April 1, 1927, he was without authority, whatever such comparison might show, to increase the price of stumpage for the coming three-year period more than 50% of the net increased sales price of lumber for the current three-year period over the price of lumber for the preceding three-year period. There was an actual decrease in the wholesale price of lumber f. o. b. mills during the three-year period beginning April 1, 1924, over the wholesale price of lumber during the preceding three-year period. This is established by proof adduced by the defendant in its Exhibit “K,” page 82, showing that the wholesale price for M feet in the Klamath District was $30.26 for the three-year period April 1921, 1922, and 1923, and that the wholesale price for the three-year period 1924, 1925, and 1926 averaged $27.00 per M feet. This fact is recognized by the defendant in its brief:
At the outset we concede and the record shows that during the pertinent three-year periods, namely, 1924-1926, there was a decrease in the wholesale price of lumber as compared with the preceding three-year period specified in the contract, namely, 1921-1923. The defendant adduced proofs to establish these facts.
In view of these conceded facts it is clear that the Commissioner of Indian Affairs was without authority to make an increase in stumpage prices for the period beginning April 1, 1927. He was not only without authority to make an increase in stumpage prices for that period, but he was prohibited from so doing by the plain provisions of the contract. The defendant, however, contends that the Commissioner of Indian Affairs and plaintiff, particularly plaintiff’s predecessors in title, had throughout the performance of the contract, and before any controversy respecting it had arisen, put a practical interpretation upon the contract at variance with its terms. It is contended that this practical interpretation is controlling and authorized the Commissioner to make the price increase in question. It is urged that the unanticipated economic exigencies that followed the post-war period and which continued for several years thereafter, and also the financial difficulties suf *223 fered by plaintiff’s predecessors in title, made it necessary for tlie Commissioner in dealing with, plaintiff and its predecessors to depart from the literal terms of the contract and put upon it a practical interpretation in order to work out substantial justice between the purchaser and the Indians. It is particularly urged that under the strict terms of the contract the Commissioner could have made a substantial increase in stumpage prices for the period beginning April 1, 1924, but that because of the practical interpretation put upon the contract by the parties he made no such increase and by so doing departed from the strict terms of the contract in order to benefit plaintiff. The defendant says that if the practical interpretation put upon the contract for the benefit of plaintiff and its predecessors can be sustained as a valid exercise of the discretion vested in the Commissioner, then it follows necessarily that the discretionary action of the Commissioner in increasing the price of stumpage by 40 cents per M feet for the benefit of the Klamath Indians, effective April 1, 1928, was likewise a valid exercise of the discretion vested in him by the contract.
We think the contention of the defendant is without merit. It is true that the Commissioner of Indian Affairs made certain concessions to plaintiff’s predecessors because of financial difficulties and other obstacles encountered by them in the early stages of performance of the contract. These concessions, however, had no relation to stumpage prices to be paid under the contract and have no materiality to the issue presented. There is no evidence whatever in the record to justify the contention that the Commissioner of Indian Affairs departed from the strict terms of the contract in any way in not advancing stumpage prices to plaintiff’s predecessors for the three-year period beginning April 1, 1924. The mere fact that the wholesale prices of lumber during the preceding three-year period were such that the Commissioner was authorized to advance stumpage prices for the period beginning April 1, 1924, had he seen fit to do so, does not show that his action in not making an increase was a concession to plaintiff not contemplated in the con *224 tract. Many factors other than the wholesale price of lumber necessarily entered into the Commissioner’s determination to increase or not to increase stumpage prices for the period beginning April 1, 1924. It must be assumed the Commissioner performed his duty in good faith and that his decision not to increase stumpage prices for the period was fully justified by the facts on which his determination was based. Furthermore, what the Commissioner may have done in 1924 is immaterial to the issue in this case. The contract divides the time in which the contract is to be performed into periods of three years each. Price adjustments are to be made in the same manner for each of the periods. The determination of the new rates to be fixed for each adjustment period “lie wholly within the discretion of the Commissioner of Indian Affairs” with the sole limitation that no increase shall be made in excess of 50% of the wholesale increase in the value of lumber during the preceding three-year- period over the value of lumber during the designated three-year period preceding. Each three-year period stands on its own bottom, and the fact that the Commissioner in his discretion declines to make an increase in stumpage prices for a period when he had authority to do so has no relevancy whatever to the price adjustment made by him for any other three-year period provided in the contract. The contention, therefore, that the increased stump-age price of 40 cents per M feet, here involved, was a valid exercise of the discretion vested in the Commissioner of Indian Affairs by the contract, is not sustained.
The defendant further contends that the contract sued upon is not a contract with the United States within the meaning of section 145 of the Judicial Code, and that the suit is, therefore, not maintainable under the Court’s general grant of jurisdiction. It is urged that in making the contract the defendant’s officials were merely acting for the Indians in their behalf and for their interest, and that consequently there was no responsibility on the part of the defendant for the performance of the contract. In other words it is contended the contract is not a contract by the defendant but a contract of the Klamath Indians. The *225 contract recited it was made by “the Superintendent of the Klamath Indian School, for and on behalf of the Klamath Indians,” and that the purchaser agreed to pay the value of the timber to “the Superintendent of the Klamath Indian School, State of Oregon, for the use and benefit of the Klamath Tribe of Indians.” The contract referred to the Klamath Indians as the “party of the first part” which agreed to sell to the plaintiff certain timber and the final agreement was that the plaintiff should pay to the Superintendent of the Klamath Indian School “for the use and benefit of the Klamath Tribe of Indians” the value of the timber at prices fixed in the contract. But that the Government was not the agent of the Indians is clear. An agent is one who acts for another under authority given by the other party. The Government did not act under any authority given by the Indians. It acted in its own right somewhat in the manner that a guardian might act for a ward. The contract was executed by the Superintendent of the Klamath Indian School by authority of law. In what he did he was acting for the Government, and in what the Government did it was acting under its own rights and powers. It was not authorized by the Indians to make the contract nor was it approved by them, it was approved by the Secretary of the Interior. While the Indians had a beneficial interest in the timber to be cut they lacked power to dispose of it, and any contract made by them would not be binding; and, as it would not be binding upon the Indians, it would not be binding upon the other party and would be merely a nullity. The contract was executed and approved by the officials of the defendant in strict accordance with the laws of the United States. Undoubtedly, the contract is a contract of the defendant within the meaning of section 145 of the Judicial Code.
From what has been said it follows that the plaintiff is entitled to recover. Judgment is therefore awarded the plaintiff in the sum of $44,772.62. It is so ordered.
Whaley, Judge; LittletoN, Judge; Greek, Judge; and Booth, Chief Justice, concur.