**FOREST LUMBER COMPANY,**
a Corporation,

v.

**The UNITED STATES in a Fiduciary Capacity** for the Klamath and Modoc Tribes and Yahooskin Band of Snake Indians and Said Klamath and Modoc Tribes and Yahooskin Band of Snake Indians.

**No. 50449.**

United States Court of Claims.
June 5, 1956.

William S. Bennet, New York City, for plaintiff. Bennet, House & Couts, New York City, were on the briefs.

David D. Hochstein, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

The plaintiff, Forest Lumber Company, instituted this suit pursuant to the provisions of a special jurisdictional act [1] to

---

1. Private Law 1088, 81st Cong., 2d Sess., January 3, 1951, 64 Stat., Part 2, p. A272, provides as follows:

*"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That, notwithstanding the provisions of section 2103 of the Revised Statutes (U.S.C., title 25, sec. 81) and notwithstanding any statute of limitations or lapse of time or any limitation upon the jurisdiction of the Court of Claims with respect to claims upon any contract implied in law, jurisdiction is hereby conferred upon such court to hear, determine, and render judgment upon the claim of the Forest Lumber Company either against the United States in a fiduciary capacity for the Klamath and Modoc Tribes and Yahooskin Band of Snake Indians or against said Klamath and Modoc Tribes and Yahooskin Band of Snake Indians in connection with the contract construed by such court in its decision dated January 12, 1938, in the case of Forest Lumber Company, a corporation, against the United States (86 Ct.Cl. 188).

"Sec. 2. The amount of any judgment awarded by the Court of Claims upon such claim shall not exceed the amount of the judgment heretofore awarded by such court in the case of Forest Lumber Company, a corporation, against the United States (86 Ct.Cl. 188, 225).

"Sec. 3. Suit upon such claim may be instituted by or on behalf of the Forest Lumber Company at any time within one year after the date of enactment of this Act. Proceedings for the determination of such claim and review thereof shall be had as in the case of claims over which such court has jurisdiction under section 1491 of title 28 of the United States Code, and the Klamath and Modoc Tribes and Yahooskin Band of Snake Indians shall be entitled to be represented in such proceedings, if they so desire, by legal counsel employed in conformity with the provisions of section 2103 of the Revised Statutes (25 U.S.C. 81). In the trial of any such suit the Court of Claims shall have jurisdiction to hear and determine any defenses available under the rules of law and equity applicable to contracts made by the United States, defenses of waiver or estoppel based on the course of dealing between the parties, and defenses based on mistake of law or fact, including any failure to collect sums payable under the contract involved in such suit by reason of mistake of law or fact, and shall determine the liability, if any, of the parties defendant as the facts and the law require. Parol evidence shall be admissible for the purposes of proving or disproving such defenses notwithstanding any limitation upon the admissibility of parol evidence in suits involving contracts

recover $44,772.62 as damages allegedly suffered by plaintiff in connection with a contract to purchase timber on the Klamath Indian Reservation in Oregon. An identical claim was filed in this court by the plaintiff under the court's general jurisdiction and was decided in plaintiff's favor in a decision reported in 1938, 86 Ct.Cl. 188. Judgment for plaintiff in the amount of $44,772.62 was reversed by the Supreme Court in United States v. Algoma Lumber Co., 1939, 305 U.S. 415, 59 S.Ct. 267, 83 L.Ed. 260, on the sole ground that the Court of Claims lacked jurisdiction of the subject matter of the claims because the contracts sued on were made on behalf of Indian Tribes and were not obligations of the United States.

The special jurisdictional act conferring jurisdiction in the present case does so notwithstanding any limitation upon the jurisdiction of the Court of Claims with respect to claims upon any contract implied in law, and authorizes the court to render judgment against either the United States in its fiduciary capacity for the Indians or against the Indians themselves in connection with the timber sale contract construed by the court in the January 12, 1938 decision, supra.

Plaintiff acquired the contract in suit by assignment in 1926. The contract had been executed on October 30, 1920, by the superintendent of the Klamath Indian School on behalf of the Klamath Tribe of Indians, and the Williamson River Logging Company, one of plaintiff's predecessors in interest in the contract. It provided for the sale by the superintendent to the lumber company of all the merchantable timber which should be marked or designated by the

seller over a specified area, part of which was unallotted Indian tribal property.

The contract also provided for separate contracts between the purchaser and those Indians holding trust patented allotments within the defined area. The contract provided for the cutting and removal of timber from 1920 to March 31, 1939. The stumpage price to be paid by the purchaser for the first 3 years of the contract term was to be the bid prices of $5.08 for yellow pine, sugar pine and incense cedar, and $1.85 for other species. The remainder of the contract term was divided into 3-year periods, each period beginning on April 1, in the years 1924, 1927, 1930, 1933 and 1936. It was provided that the stumpage prices for each species for such 3-year periods would be as fixed by the Commissioner of Indian Affairs, in the manner prescribed in the contract. The contract then provided under what circumstances stumpage prices might be increased. It also prescribed a formula for computing such increase and a limitation on the amount by which the stumpage price might be advanced for any 3-year period. The contract conferred upon the Commissioner of Indian Affairs the right to fix stumpage rates to be paid during any 3-year period with 2 exceptions: (1) in no event might the stumpage rate be less than the rates bid and fixed for the first 3-year period, and (2) that in the event the Commissioner determined an advance was warranted under the provisions of the contract, such advance could not exceed 50 percent of the difference between the average mill run wholesale net value of lumber of that species for the 3 years just preceding the date on which the particular 3-year period in question com-

in writing. Any set-off, counterclaim, claim for damages, or other demand set up on the part of any defendant shall be heard and determined by the court in accordance with the provisions of section 2508 of title 28 of the United States Code.

"Sec. 4. Any part of any judgment rendered hereunder which represents sums actually deposited to the credit of said Klamath and Modoc Tribes and Yahooskin Band of Snake Indians for timber

cut from tribal lands shall be paid by the Secretary of the Treasury, upon appropriation by the Congress, from any funds in the Treasury of the United States to the credit of said tribe. Any other part of any judgment rendered shall be payable in the same manner as in the case of claims over which the Court of Claims has jurisdiction under section 1491 of title 28 of the United States Code."

menced and the wholesale price, of lumber for the 3-year period prior to the first 3-year period mentioned. For example, in connection with a possible adjustment in stumpage price for the 3-year period commencing April 1, 1927, if the wholesale value of lumber for the 3 years 1924, 1925 and 1926 had been $25, and the wholesale value of the same species for the 3 years, 1921, 1922 and 1923, had been $24, the difference thus being $1, any increase in stumpage rates justified under another provision of the contract would be limited to 50 cents, i. e., 50 per cent of such $1 difference.

The first issue in this case involves a dispute between the parties as to the proper interpretation of the contract provisions relative to adjustments in stumpage prices. The provisions in question are as follows:

"For purposes of stumpage price adjustments by the Commissioner of Indian Affairs at the close of the first period [March 31, 1924] of the contract as specified above, it is hereby stipulated by the Superintendent and the purchaser that the average mill run wholesale net value per thousand feet lumber measurement f. o. b. mills in Southern Oregon and Northern California, during the 3 years ending January 1, 1920, have been twenty-two dollars and fifty cents ($22.50) for yellow pine (including the so-called "bull-pine"), sugar pine, and incense cedar, and seventeen dollars ($17.00) for other species.

"In determining the stumpage rates to be designated for all timber scaled during the 3-year period beginning April 1, 1924, the average mill run wholesale net values of lumber f. o. b. mills operating in Southern Oregon and Northern California during the 3 years directly preceding January 1, 1924, will be compared with the values of $22.50 and $17.00 stipulated in the preceding paragraph [for the years 1917–1920] as basic values, and the cost of logging

operations and lumber manufacture during the said 3 years will be compared with the cost of such operations and manufacture during the 3-year period preceding January 1, 1920, for the purpose of ascertaining, so far as is practicable, whether there has been generally in the lumber industry in the specified region *an increase in the margin of profit on logging and manufacturing operations during the 3-year period directly preceding January 1, 1924.*

"An advance in stumpage prices prescribed by the Commissioner for the 3-year period beginning April 1, 1924, shall not exceed 50 percent of the difference between the average mill run wholesale net value of lumber of that species f. o. b. mills as stipulated above and that for the same species during the 3 years directly preceding January 1, 1924. In the discretion of the Commissioner a reduction in the stumpage price of any species may subsequently be made to correct any error or to afford the purchaser relief from a market depression that deprives the purchaser of a substantial margin of profit: *Provided,* That the stumpage prices of no species will ever be reduced below the rate bid for the initial period of the contract.

"For the 3-year periods of the contract beginning April 1, 1927, 1930, 1933, and 1936, readjustment of stumpage prices may be made in the same manner as for the period beginning April 1, 1924, except that the prices determined and used for the preceding 3-year period will in each case be considered as the stipulated prices that are to be compared with the average prices obtaining during the succeeding 3-year period." [Italics and matter in brackets added.]

As of April 1, 1924, the beginning of the second 3-year period, the Commissioner of Indian Affairs decided not to increase stumpage rates for the next 3 years, although the average mill run

wholesale net value of lumber, f.o.b. mills, etc., for white and sugar pine had increased to $30.26 for the years 1921, 1922 and 1923, over the stipulated price of $22.50 for 1917, 1918 and 1919, and also over the actual price of $23.10 for the same period. (See finding 7.) The record does not disclose logging and manufacturing *costs* for the 1921, 1922, and 1923 period, but assuming that they were such that there was an increase in the *margin of profits on such costs* of logging and manufacturing operations in that period over 1917, 1918 and 1919, the Commissioner would have been justified, under the contract, in increasing the stumpage price on April 1, 1924, subject only to the 50-percent limitation provided for in the contract above quoted.

For the third 3-year period beginning April 1, 1927, the Commissioner of Indian Affairs decided to increase stumpage prices $1 per thousand feet, such increase not to become effective until April 1, 1928.

After vigorous protest by plaintiff that any increase was unjustified under the contract, the Commissioner in March 1928, notified plaintiff that he would impose an increase of only 40 cents per thousand feet, effective April 1, 1928, the beginning of the second year of that 3-year period. The 40-cent increase went into effect on April 1, 1928 (the beginning of the second year of the third 3-year period), and remained in effect despite plaintiff's protests, until March 31, 1930, during which period plaintiff cut 111,931,560 feet of yellow and sugar pine. That quantity of lumber at the 40-cent advance in stumpage rate resulted in the $44,772.62 overpayment sought to be recovered by plaintiff in this suit, as having been imposed contrary to the terms of the contract.

In determining whether or not he could impose any advance in stumpage rates for the 3-year period commencing on April 1, 1927, the Commissioner of Indian Affairs was required by the terms of the contract to compare the wholesale lumber prices for the 3 years just past (1924, 1925, and 1926) with the wholesale lumber prices for the preceding 3 years (1921, 1922, and 1923). Such a comparison would have revealed that the average wholesale price of lumber for the 1921, 1922, 1923 period was $30.25, whereas the price for the next 3 years went down to $27.00. In the face of this *decrease* in lumber prices, the Commissioner was precluded by the terms of the contract from making any advance in stumpage rates for the 1927–1929 period and his imposition of the 40-cent advance in that period was a clear violation of the express terms of the contract provisions.

Defendant concedes that a comparison of the wholesale lumber prices for 1921–1923 with the 1924–1926 prices does reveal a decrease in the wholesale price of lumber, but defendant says that under the terms of the contract the Commissioner was permitted to compare the 1924–1926 wholesale price of $27.00 with the stipulated price for the 3-year period prior to the execution of the contract, 1917–1919, of $22.50, skipping the intervening years 1921–1923, and that since such a comparison would result in an *increase* in wholesale prices in the later period over the earlier one, the stumpage rate advance in 1928 was justified.

The contract provides that in making stumpage price readjustments for each 3-year period beginning with the April 1, 1927, period, the Commissioner should use the same method used for the period beginning April 1, 1924, "except that the prices determined and used for the preceding 3-year period will in each case be considered as the stipulated prices that are to be compared with the average prices obtaining during the succeeding 3-year period." This means in our opinion that the two 3-year periods used for comparison must run consecutively regardless of the fact that the Commissioner might have made no stumpage rate advance in the earlier period, i. e., on April 1, 1924. The fact that no rate advance was made at that time did not justify the Commissioner in using wholesale prices prevailing during a 3-year period beginning *9* years prior to April

1, 1927, for the purpose of determining whether or not an advance in stumpage rates was proper for the 3-year period commencing April 1, 1927.

Defendant next argues that it should not be held to strict compliance with the terms of the contract relative to stumpage rate adjustment for the 3-year period commencing on April 1, 1927, because, on the occasion of the previous 3-year period, the Commissioner of Indian Affairs had refrained from imposing an advance in stumpage rates although the increased profits enjoyed by the lumber industry in the area for the 3-year period just prior to April 1, 1924, would have justified such a rate advance. Defendant urges that by not imposing a stumpage rate advance on April 1, 1924, the Commissioner was departing from the terms of the contract for the benefit of the contractor and that therefore it would be only equitable for him to depart from the contract terms on April 1, 1927, for the benefit of the Indians and at the expense of the contractor.

As pointed out by Judge Williams in the earlier opinion and decision of the court in this case, the decision of the Commissioner in 1924, to refrain from imposing a stumpage rate advance, was not a departure from the strict terms of the contract which, on the contrary, gave to the Commissioner unlimited discretion *not* to impose an advance in stumpage rates for any particular 3-year period. Accordingly, no principles of waiver or estoppel in favor of defendant come into existence in connection with this action of the Commissioner.

Finally, defendant urges that plaintiff's payment of the 40-cent stumpage advance in 1928 and 1929, although under protest, amounted in law to a "voluntary" payment which cannot be recovered. Defendant relies on the principle that payment of money upon an illegal demand with full knowledge of all the facts which render such demand illegal, and without any immediate and urgent necessity therefor, is deemed a voluntary payment despite the filing of a written protest at the time of making the payment. Union Pac. Railroad Co. v. Dodge County, 98 U.S. 541, 25 L.Ed. 196. Defendant insists that the alleged overpayment of the 40-cent stumpage advance was not made under duress or under a threat by the Government that the contract would be canceled. The issue thus presented is, do the facts of record herein establish that the alleged overpayments were voluntary?

We are of the opinion that under the terms of the contract and under the facts and circumstances shown by the record, the payment by plaintiff of the 40-cent advance in stumpage rates was not voluntary. Under the terms of the contract, payment for stumpage to be cut in the future was paid for in advance by the making by the plaintiff of substantial deposits with defendant. Against that deposit account defendant made charges representing the amount of timber cut at the stumpage rate fixed for the period during which the cutting occurred. In addition, the purchaser's bid had been accompanied by a deposit in the amount of $40,000, which was retained by the Commissioner to insure faithful performance of the contract. The purchaser also had to post a bond in the penal sum of $50,000. The contract provided that prior to the time when the stumpage value of timber cut under the contract should exceed the $40,000 cash deposit, the purchaser had to make additional cash deposits of not less than $10,000 each to cover further cutting to insure that the stumpage value of the timber cut should not exceed the cash deposit in the hands of the Government. Failure of the purchaser to make the required cash deposits in advance of actual cutting, or failure of the purchaser to cut the timber and remove it as marked or designated by the defendant, would have subjected the purchaser to cancellation of its contract and forfeiture of its bond.

When the stumpage rates were improperly and illegally advanced in 1928 and 1929, the purchaser could not refuse to pay such rates because it was not in

a position to do so since it had already on deposit more than sufficient money to cover timber to be cut at the advanced rate. The most the purchaser could do under those circumstances was to protest the imposition of the rate advance and request that its funds on deposit not be charged with such advance. This the purchaser did, and this was the most it could have done without risking cancellation of the contract. Its protests were denied and its deposits were charged. Such actions did not on plaintiff's part amount to a voluntary payment of the stumpage rate advances imposed in 1928 and 1929.

The special jurisdictional act provides for the payment of any judgment made by the court as follows:

"Sec. 4. Any part of any judgment rendered hereunder which represents sums actually deposited to the credit of said Klamath and Modoc Tribes and Yahooskin Band of Snake Indians for timber cut from tribal lands shall be paid by the Secretary of the Treasury, upon appropriation by the Congress, from any funds in the Treasury of the United States to the credit of said tribe. Any other part of any judgment rendered shall be payable in the same manner as in the case of claims over which the Court of Claims has jurisdiction under section 1491 of title 28 of the United States Code."

Plaintiff is entitled to recover the amount of $44,772.62 and judgment is rendered therefor. In view of the above-quoted provision of the special jurisdictional act, payment of that part of the judgment which shall be paid in the same manner as in the case of claims over which this court has jurisdiction under section 1491 of title 28 of the United States Code, will be suspended pending the making of a stipulation by the parties or a determination by the proper Government officials of the amount so to be paid under Rule 38(c), 28 U.S.C.A.

It is so ordered.

JONES, Chief Judge, and LARAMORE and MADDEN, Judges, concur.

WHITAKER, Judge, took no part in the consideration or decision of this case.

