### UNITED STATES v. SINNOTT and others.

*(Circuit Court, D. Oregon. January 11, 1886.)*

1. INDIAN SAW-MILL.
    Lumber made at the saw-mill on the Grand Ronde Indian reservation is in fact the "property" of the Indians thereon, and not that of the United States, within the purview of section 3618 of the Revised Statutes; and the agent, subject to the instructions of the commissioner of Indian affairs, may dispose of any portion of the same, and apply the proceeds to the support of the mill, or otherwise for the benefit of the Indians, without reference to section 3617

of the Revised Statutes, requiring money received for the use of the United States to be deposited to its credit.

2. DOUBLE PAYMENT OF SALARY.

The superintendent of Indian affairs in Oregon returned to the department two vouchers for the payment by him of the salary of the agent of the Grand Ronde reservation for the second quarter of 1873, each being marked "triplicate," from which the accounting officers assumed that the salary was paid twice, and charged the agent with the amount of such payments in the settlement of his official accounts. *Held,* (1) that on the face of the transaction it was apparent that these two papers were but parts of one voucher taken in triplicate, and that there was but one payment; and (2) that, if there had been two payments, the agent, although liable for the excess, as an individual, as for money had and received to the use of the United States, was not liable therefor on his bond.

3. MONEY PAID BY AGENT WITHOUT AUTHORITY.

The defendant Sinnott employed a person on the reservation aforesaid, as "superintendent of farms and mills," and, in reporting the fact to the commissioner, said that he did so at the instance of "some political friends," but there was really no necessity for the employment, and advised that it be disapproved, which was done; but the agent continued the person in such employment, and paid him therefor, and, on settlement of his accounts at the treasury, $1,500 thereof was disallowed. *Held,* that the payments being not only without authority, but contrary thereto, were illegal, and the agent and his sureties are liable therefor.

At Law.

*James F. Watson,* for plaintiff.

*William B. Gilbert,* for defendants.

DEADY, J. This action is brought on the bond dated March 5, 1872, of the defendant Patrick B. Sinnott, as Indian agent at the Grand Ronde reservation, and of the defendants Luzerne Besser and E. Cahalin, as sureties therein, to recover a balance of $3,048.18, alleged and ascertained to be due the plaintiff thereon, at the United States treasury, March 21, 1885, on account of money and property received by said Sinnott under said bond and not duly accounted for, with interest from said date at the rate of 6 per centum per annum, and costs and disbursements. The answer of the defendants consists of a denial of the failure of Sinnott to account, and the correctness and justice of the settlement at the treasury. The case was heard by the court without the intervention of a jury. The sum sought to be recovered consists of these items, namely: (1) $1,179, the proceeds of the sale of certain lumber made at the Indian saw-mill; (2) $375, the amount of a second payment by the superintendent to the agent on his salary account, for the second quarter of the year 1873; (3) $1,500 paid to C. D. Folger, between July 1, 1874, and August 25, 1876, as "superintendent of farms and mills," less a credit of $5.82 for an unexpended balance deposited to the credit of the United States. The mill at which this lumber was sawed was erected by the United States for the Indians of this reservation in pursuance of the treaty with the Umpquas, of November 29, 1854, (10 St. 1125,) and that with the Molallas, of December 21, 1885, (12 St. 981,) and in fact belongs to them; and therefore, in my judgment, such lumber was not the "property" of the United States, within the purview of sec-

tion 3618 of the Revised Statutes, which requires the proceeds of any sale thereof to be conveyed into the treasury; nor was the money received therefor, received "for the use of the United States," within the purview of section 3617 of the Revised Statutes.

As the agent and guardian of the Indians, it was the duty of the defendant Sinnott, subject to the instructions of the commissioner of Indian affairs, to dispose of the lumber made at this mill, and not needed by the Indians for their own use, and to use or apply any money or other property received therefor for their benefit. This lumber was the product of Indian labor, combined with the labor and skill of white men, that the United States bound itself to furnish them in consideration of the cession of their lands. It was not, then, properly speaking, the property of the United States; and certainly not within the contemplation of the sections of the Revised Statutes, 3617, 3618. In this case it appears from the treasury statement and the defendant's accounts that in 1873 he received $1,079.31 from the sale of lumber, of which he deposited to the credit of the United States, or in some way conveyed into its treasury, $100.31, and used the remainder in payment of current expenses of the agency, including the wages of the sawyer and loggers, first charging himself with the amount received. At the time he had no instructions to make any other or special disposition of these funds, and did not receive any until October, 1876, when he was instructed to deposit the same to the credit of the United States.

In the second quarter of 1874 the defendant furnished $200 worth of this Indian lumber for the building of the manual labor school on the reservation, and paid for it out of the funds furnished and designated for that purpose. The money received for this lumber he then applied to the payment of current expenses, first charging himself with the amount, as in the case of the funds so received in 1873.

It is objected that this transaction was contrary to section 3679 of the Revised Statutes prohibiting expenditures in any department of the government in excess of appropriations. But, certainly, this section has no application in the premises. There is no question but that the money expended for the lumber for the labor school was appropriated for that purpose, and the agent had as much right to use it in the purchase of material from the Indians as any one. So that the item of $200 is in the same category as the one of $979, and the question concerning both is, was the money disbursed or accounted for according to law? As I have said, in the absence of any instruction to the contrary, in my judgment it was; and the defendant Sinnott should be credited with the amount.

And, even if the disposition of the money received from the sale of the lumber was a technical violation of section 3617 or 3618 of the Revised Statutes, there is no pretense but that the defendant acted in good faith, and the Indians to whom the money really belonged had the benefit of it. And therefore, upon any equitable view of the

transaction, he is entitled to be credited with the amount. *U. S. v. Roberts,* 10 Fed. Rep. 540; *U. S.* v. *Stowe,* 19 Fed. Rep. 807.

The item of $375, for double payment of salary, is manifestly a mistake of the superintendent's. It is admitted that the superintendent, Odeneal, who was subpœnaed as a witness, but is unable to attend, would testify, if sworn, that he did not pay the salary twice. Sinnott swears positively that he never received the money but once, and there is nothing in the treasury statement to the contrary. It appears from that that the superintendent paid the agent his salary for the second quarter of 1873, and took a voucher therefor in triplicate, and for some reason, or by mistake, sent two parts of such triplicate voucher, instead of one, with his accounts to the department. Upon this, the accounting officers have assumed, without, as it appears to me, any sufficient reason, that these two parts of one voucher relate to two different and distinct payments of the same amount for the same quarter's salary. Upon a parity of reasoning, if the superintendent had, for any cause, sent the three parts of this voucher to the department, the defendant would have been charged with receiving this salary thrice. It is but fair to add that there is a slight difference in the language of these two papers, in the statement of the account,—the one being for "salary" as Indian agent, etc.; the other for "services rendered the Indian department," as Indian agent, etc. But there is no difference in the language of the receipt by Sinnott or the certificate of payment by the superintendent, and manifestly they are parts of one transaction, and relate to but one payment.

It would be absurd, as well as unjust, to charge Sinnott with the wrongful receipt of $375 on any such state of facts as this. And if the accounting officers have erroneously credited the superintendent's account with this amount as having been actually paid out by him, the agent is not responsible for the mistake. And furthermore, if this salary had been paid to the agent twice, he would not be liable therefor on his bond. The security for the proper disbursement of this money is the bond of the superintendent,—the officer who received it for that purpose. The agent's bond covers all moneys that come "into his hands," as agent for the Indians, but not that which was paid to him, rightfully or wrongfully, as a compensation for his services. He would be liable, of course, as an individual for money had and received by him, by mistake or otherwise, that belongs to the United States, but not on his bond as agent; nor would his securities be liable therefor at all.

On July 2, 1874, Sinnott wrote to the commissioner of Indian affairs a statement of the employes engaged on the reservation. Among these was C. D. Folger, "superintendent of farms and mills," at a salary of $1,000 per annum,—a place which seems to have been created for his benefit. On the seventh of the same month he wrote to the commissioner that he "was induced" to employ Folger "by

some political friends" of his, but that, in his "judgment, a superintendent of mills is unnecessary," and that he "had better disapprove of the engagement of the superintendent of mills." And as to a superintendent of farms, he left that with the commissioner, saying, in a sentence that appears to lack something: "I attended to the business of farmer since I came here myself, and now that the farm is to be discontinued after harvest." On July 25th the commissioner wrote in reply, disapproving of "the appointment of C. D. Folger" as unnecessary, the miller being sufficient to run the mill and the agent to manage the farm. But on September 5th he wrote again to the commissioner, urging the approval of Folger's employment, to which the commissioner replied on September 30th, refusing to approve the same. And on March 9, 1875, the commissioner wrote again to the agent, calling his attention to the fact that Folger's name appeared in his report of employes for the third and fourth quarters of 1874 "as superintendent of farms and mills;" and, after referring to the correspondence between them on the subject, closed by saying: "You are now informed that vouchers for services performed by Mr. Folger will not be considered by this office." There is no pretense that Folger performed any service about the mill or farm, but it is claimed that he was of some use, or might have been, in showing the Indians the corners or boundaries of the allotments of lands which had lately been surveyed and assigned to them in severalty. He also acted as clerk for the agent, and in that capacity received and opened his official correspondence.

But the agent was not authorized to employ him in any capacity without the approval of the commissioner, and certainly there was no excuse for his doing so after the employment was expressly disapproved by the latter. His excuse is that he never received the letter of March 9th, and he surmises and suggests that Folger may have suppressed it for fear of losing his place; and, at his request, a day was given him to produce Folger as a witness on this point. But the party, though living in the city, was not produced or examined. But the letter of September 30th was sufficient without anything further to make the employment plainly illegal.

It is true that some of the payments, apparently amounting in all to $655, were on what was thought equitable ground, allowed by the Indian bureau, after being rejected by the treasury auditor. For instance, the $250 paid for the third quarter of 1874, which was allowed on the supposition that it might have been paid before the letter of September 30th reached the agent. But this act of grace, as to part of the disbursement, does not render any of it legal, and is no defense to a claim to recover the balance. The money was not only disbursed without authority, but directly in the face of it; and, what is more, with the admitted knowledge that the employment was merely to serve the interest of or oblige "some political friends," and not the public good.

The plaintiff is entitled to a judgment against the defendants for this sum, less the credit of $5.82, with interest, in all $1,565.14, with costs and disbursements.