UNITED STATES *v.* ALGOMA LUMBER CO.*

No. 245.    Argued December 16, 1938.—Decided January 3, 1939.

---

* Together with No. 246, *United States* v. *Forest Lumber Co.,* and No. 247, *United States* v. *Lamm Lumber Co.,* also on writs of certiorari to the Court of Claims.

*Mr. Paul A. Sweeney,* with whom *Solicitor General Jackson, Assistant Attorney General Whitaker,* and *Mr.*

*James J. Sweeney* were on the brief, for the United States.

*Messrs. Carl D. Matz* and *William S. Bennet,* with whom *Mr. Jesse Andrews* was on the brief, for respondents in Nos. 245 and 246.

*Mr. Ralph H. Case* for respondent in No. 247.

MR. JUSTICE STONE delivered the opinion of the Court.

Decision of these cases turns on the question whether certain contracts for the sale of timber on land of the Klamath Indian Reservation in Oregon, executed by the Superintendent of the Klamath Indian School by authority of an Act of Congress, are contracts of the United States upon which suits may be maintained in the Court of Claims.

Section 7 of the Act of Congress of June 25, 1910, c. 431, 36 Stat. 855, 857, provides that the "timber on unallotted lands of any Indian reservation may be sold under regulations to be prescribed by the Secretary of the Interior, and the proceeds from such sales shall be used for the benefit of the Indians of the reservation in such manner as he may direct." Section 8 of the Act provides that "the timber on any Indian allotment held under a trust or other patent containing restrictions on alienations, may be sold by the allottee with the consent of the Secretary of the Interior and the proceeds thereof shall be paid to the allottee or disposed of for his benefit under regulations to be prescribed by the Secretary of the Interior."

The present suits were brought in the Court of Claims by respondents against the United States to recover alleged overpayments of amounts due upon contracts for the purchase of timber upon certain unallotted and allotted Indian lands in the Klamath Reservation. The con-

tracts were executed pursuant to §§ 7 and 8 of the Act of 1910 and regulations of the Secretary of the Interior. They provided that the prices fixed for the timber to be cut should be readjusted by the Commissioner of Indian Affairs at intervals of three years, but that permitted increases in price should "not exceed fifty per cent of the increase in the average mill run wholesale net value of lumber . . . during the three years preceding January 1 of the year in which the new prices are fixed."

The Court of Claims in each case found that prices fixed by the Indian Commissioner had exceeded the permitted increases and that in consequence there had been an overpayment of the amounts due under the contracts. It held that they were contracts of the United States and in each case gave judgment against the government for the amount of the overpayments. *Algoma Lumber Co.* v. *United States,* 86 Ct. Cls. 226; *Forest Lumber Co.* v. *United States,* 86 Ct. Cls. 188; *Lamm Lumber Co.* v. *United States,* 86 Ct. Cls. 171. We granted certiorari, October 10, 1938, the questions involved being of public importance in the administration by the United States of Indian lands and in defining the jurisdiction of the Court of Claims.

The petitions for certiorari challenged the jurisdiction of the Court of Claims in terms sufficiently broad to raise the question, not considered below or argued here, whether, assuming the contracts were obligations of the United States, as the court below held, suits to recover the overpayments are upon quasi contracts or contracts "implied in law" not within the jurisdiction conferred on the Court of Claims by § 145(1) of the Judicial Code, 28 U. S. C. § 250(1).[1] *Merritt* v. *United States,* 267 U. S. 338;

---

[1] " . . . The Court of Claims shall have jurisdiction to hear and determine the following matters:

"First. All claims founded upon . . . any contract, express or implied, with the Government of the United States . . ."

*United States* v. *Minnesota Investment Co.,* 271 U. S. 212; *Goodyear Co.* v. *United States,* 276 U. S. 287. But the question chiefly discussed in brief and argument before us is whether the contracts in suit are obligations of the United States, so as to give rise to claims founded upon them within the jurisdiction of the Court of Claims. As determination of this question is decisive of the case, we do not consider whether, even if the contracts were obligations of the United States, the claims are for the recovery of unjust enrichment upon contracts "implied in law" not within the jurisdiction of the court.

For purposes of decision the contracts in No. 245, *United States* v. *Algoma Lumber Co.,* may be taken as typical of those in the other cases. Pursuant to §§ 7 and 8 of the Act of 1910 and regulations of the Secretary of the Interior adopted June 29, 1911, timber upon designated lands within the Klamath Reservation was offered for sale. Bids submitted by respondent, Algoma Company, were accepted, and on July 28, 1917, the contract of sale was executed by the company and by the Superintendent of the Klamath Indian School, pursuant to departmental regulations, and was approved by the Assistant Secretary of the Interior on September 14, 1917.

The area designated embraced approximately 15,700 acres, all of which were unallotted except 2,240 acres of allotted lands. The contract provided for the sale of the timber on the unallotted lands upon terms and conditions not now material. It required that the purchase money be paid to the Superintendent "for the use and benefit of the Klamath Tribe," and that the Algoma Company enter into separate contracts with the individual Indian allottees who desired to sell the timber standing on their allotments. In carrying out the provisions of the contract the Algoma Company, with the approval of the Secretary, entered into separate contracts with twenty-one indi-

vidual allottees for purchase of the timber on their allotments upon terms similar to those of the contract for the purchase of timber on the unallotted lands.

As required by the contracts, the purchase payments by the. Algoma Company, including the alleged overpayments, were made to the Superintendent for the benefit of the Indians. Pursuant to the Act of March 3, 1883, 22 Stat. 582, 590, as amended May 17, 1926, 44 Stat. 560, all moneys received from the unallotted lands, less expenses, were deposited by the Superintendent in the treasury of the United States in an account designated "Indian Moneys, Proceeds of Labor." Payments for timber on the allotted lands, less expenses, were deposited by the Superintendent in private state banks and credited on his own books to the allottees according to their respective interests. Act of July 1, 1898, 30 Stat. 571, 595; Act of April 30, 1908, 35 Stat. 70, 73; Act of June 25, 1910, 36 Stat. 855, 856. All the proceeds of sale are required to be held and used by the Secretary for the benefit of the Indians. Act of March 2, 1887, 24 Stat. 449, 463; Act of May 18, 1916, 39 Stat. 123, 158; Act of Mar. 2, 1907, 34 Stat. 1221; Act of May 25, 1918, 40 Stat. 561, 591.

The Klamath Reservation was set apart as tribal lands under the Treaty with the Klamath Tribe of February 17, 1870, 16 Stat. 707, from lands immemorially possessed by them. See *United States* v. *Klamath Indians,* 304 U. S. 119, 121. Under the provisions of the treaty and established principles applicable to land reservations created for the benefit of the Indian tribes, the Indians are beneficial owners of the land and the timber standing upon it and of the proceeds of their sale, subject to the plenary power of control by the United States, to be exercised for the benefit and protection of the Indians. *United States* v. *Klamath Indians,* 304 U. S. 119; cf. *United States* v. *Candelaria,* 271 U. S. 432; *Mott* v. *United States,* 283 U. S. 747; *Chippewa Indians* v. *United States,* 301 U. S.

358, 375; *United States* v. *Shoshone Tribe,* 304 U. S. 111, 116. The United States acquired no beneficial ownership in the tribal lands or their proceeds, and however we may define the nature of the legal interest acquired by the government as the implement of its control, substantial ownership remained with the tribe as it existed before the treaty. *United States* v. *Shoshone Tribe, supra,* 116.

The action of Congress in authorizing the sale of the timber, and the contracts prescribed under its authority by departmental regulations and approved by the Secretary, are to be viewed as the means chosen for the exercise of the power of the government to protect the rights and beneficial ownership of the Indians. The means are adapted to that end. Neither the United States nor any officer purporting to act on its behalf is named a party to the contract. By its terms the contract is declared to be entered into "between the Superintendent of the Klamath Indian School, for and on behalf of the Klamath Indians, party of the first part" and the Lumber Company, "party of the second part." It is thus on its face the contract of the Klamath Indians executed by the Superintendent, acting as their agent. The form of the contract and the procedure prescribed for its execution and approval conform to the long-established relationship between the government and the Indians, under which the government has plenary power to take appropriate measures to safeguard the disposal of property of which the Indians are the substantial owners. Exercise of that power does not necessarily involve the assumption of contractual obligations by the government. Their assumption is not to be presumed in the absence of any action taken by the government or on its behalf indicating such a purpose. See *In re Sanborn,* 148 U. S. 222, 227; *Turner* v. *United States,* 248 U. S. 354, 359. In this, as in any other case of a written contract, those who are parties to and bound

by it are to be ascertained by an inspection of the document, and its provisions are controlling in the absence of some positive rule of law or provision of statute requiring them to be disregarded.

Respondents point only to § 7 of the Act of 1910 and the regulations prescribed under it as compelling a different result. They argue that the requirements that the manner of sale be prescribed by the Secretary, that the contracts be executed by the Superintendent and approved by the Secretary, and that the prices of lumber be fixed by the Indian Commissioner, indicate a purpose to make the United States, acting as guardian or trustee of the Indians through the Secretary and Superintendent, the contracting party. But, as we have said, all that was done by the government officials in supervising the execution of the contracts and their performance was consistent with the exercise of its function as protector of the Indians without the assumption by the United States of any obligation to the purchasers of the timber, and no implied obligation on its part arises from the performance of that function.

Before the Act of 1910, the Act of February 16, 1889, 25 Stat. 673, had given the President authority, from year to year, under such regulations as he might prescribe, to authorize the Indians on reservations or allotments to sell dead timber, standing or fallen, on such reservations. The contracts authorized were to be those of the Indians and not of the United States. See *Pine River Logging Co.* v. *United States,* 186 U. S. 279.[2]

The Act of 1910 enlarged the authority conferred by the earlier act so as to permit the sale of living timber on

[2] In some instances Congress has passed special acts conferring jurisdiction on the Court of Claims to entertain suits brought against the Indians on their contracts. 35 Stat. 444; 36 Stat. 287; see *Green* v. *Menominee Tribe,* 233 U. S. 558; cf. 26 Stat. 636; 27 Stat. 86; 35 Stat. 457; 36 Stat. 287.

the reservations under regulations prescribed by the Secretary of the Interior. It did not command departure from the earlier practice of selling the timber by contracts entered into between the Indians and the purchasers, and it seems clear that in prescribing that the contracts be entered into with the Indians the Secretary adhered to this practice, but with the added safeguard that the contracts were to be effected for them through the agency of the Superintendent who, for many purposes, acts as the agent of the Indians. See *United States* v. *Sinnott,* 26 F. 84, 86; cf. *Parks* v. *Ross,* 11 How. 362, 374.

We do not stop to inquire whether the government could confer authority upon him to execute contracts binding upon the Indians, or whether the Act of 1910 dispensed with the formalities required of contracts with the Indians by R. S. § 2103, 25 U. S. C. § 81, omitted in the case of the present contracts. See *Green* v. *Menominee Tribe,* 233 U. S. 558. Infirmities, if any, in respondents' contracts with the Indians could not impose on the United States a liability which the contracts do not purport to undertake in its behalf.

As the Court of Claims found that the contracts for the sale of timber on allotted lands were entered into by individual allottees as prescribed by § 8 of the Act of 1910, they stand on no different footing, as obligations of the United States, from the tribal contract or similar contracts entered into under the Act of 1889.

Since none of the contracts in suit were contracts or obligations of the United States, it is plain that receipt, by the Treasury of the United States, of payments made under them to the Superintendent for "the use and benefit" of the Indians, even though made under protest, gave rise to no contract for repayment implied in fact on the part of the United States, and that the cause of action, if any, is not within the jurisdiction of the Court of Claims. *Merritt* v. *United States, supra; United States*

v. *Minnesota Investment Co., supra; Goodyear Co.* v. *United States, supra.*

*Reversed.*

MR. JUSTICE MCREYNOLDS and MR. JUSTICE ROBERTS took no part in the consideration or decision of this case.