**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WAPATO HERITAGE, L.L.C.,
    *Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA; UNITED
STATES DEPARTMENT OF THE
INTERIOR; UNITED STATES
BUREAU OF INDIAN AFFAIRS,
    *Defendants-Appellees.*

No. 09-36150

D.C. No.
2:08-cv-00177-
RHW

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Robert H. Whaley, Senior District Judge, Presiding

Argued and Submitted
January 13, 2011—Seattle, Washington

Filed March 22, 2011

Before: Susan P. Graber and Milan D. Smith, Jr.,
Circuit Judges, and Charles R. Breyer,* District Judge.

Opinion by Judge Milan D. Smith, Jr.

---

*The Honorable Charles R. Breyer, United States District Judge for the
Northern District of California, sitting by designation.

**COUNSEL**

R. Bruce Johnston, Law Office of R. Bruce Johnston, PS, Bainbridge Island, Washington, for the plaintiff-appellant.

Andrew S. Biviano, Assistant United States Attorney, Spokane, Washington, for the defendants-appellees.

**OPINION**

M. SMITH, Circuit Judge:

Plaintiff-Appellant Wapato Heritage, L.L.C. (Wapato), appeals the district court's order denying its motion for summary judgment and motion for reconsideration, and granting Defendants-Appellees' motion for summary judgment and motion to dismiss. We address whether Wapato's predecessor-in-interest, William Wapato Evans, Jr. (Evans), effectively exercised his option to renew a lease agreement (Lease) between Evans and certain Native American landowners (Landowners) covering real property known as Moses Allotment No. 8 (MA-8). The district court ruled that Evans did not comply with the Lease's requirements that he notify all the Landowners that he intended to renew the Lease. Wapato, the current holder of all the Lessee's rights under the Lease, timely appealed. We have jurisdiction under 28 U.S.C. § 1291.

Wapato argues on appeal that the terms of the Lease are ambiguous as to whether the Bureau of Indian Affairs (BIA) was a Lessor under the Lease, therefore precluding summary judgment. We hold that the Lease is not ambiguous and that the BIA was not a Lessor under the Lease. We also hold that Evans (and later Wapato) failed to provide the required notice to the Landowners and thus did not effectively exercise the option to renew the Lease. Wapato's other claims of error are

addressed in a memorandum disposition filed contemporaneously with this opinion. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1907, the United States granted MA-8 to Wapato John as part of an agreement between the Moses Band and the Secretary of the Interior (Secretary). The United States holds MA-8 in trust for Wapato John and his heirs, one of whom was Evans. Evans's grandsons are currently the sole owners of Wapato Heritage, L.L.C. The Department of the Interior (Department), which has delegated its authority to the BIA, administers MA-8. The Colville Agency (Agency) is a local BIA agency, located in Nespelem, Washington.

In 1982, Evans owned an approximate 5.4% beneficial interest in MA-8, and sought to negotiate a 25-year ground lease of all the landowner rights in MA-8. Sixty-four percent of the Landowners (including Evans) eventually consented to the Lease. A majority of the Landowners signed a "Statement of Awareness," which outlined the material provisions of the Lease and authorized the Superintendent of the Agency to execute the Lease on their behalf pursuant to 25 C.F.R. § 162.2[(a)](5). In due course, the Secretary authorized George Davis, the Superintendent, to sign the Lease. Pursuant to that authority, Davis approved the Lease (Lease No. 82-21) on February 2, 1984, on behalf of the consenting Landowners, the remaining 36% of the trust beneficiaries, and the Secretary. The Lease was executed in conformity with 25 U.S.C. § 415 and Part 162 of the implementing regulations.

The Lease contains an option to renew, which reads as follows:

3. *TERM — OPTION TO RENEW*:

The term of this lease shall be twenty-five (25) years, beginning on the date that the lease is approved by the Secretary.

This lease may be renewed at the option of the Lessee for a further term of not to exceed twenty[-]five (25) years, commencing at the expiration of the original term, upon the same conditions and terms as are in effect at the expiration of the original term, provided that notice of the exercise of such option shall be given by the Lessee to the Lessor and the Secretary in writing at leas[t] twe[l]ve (12) months prior to said expiration of original term.

The Lease defines Evans as "Lessee" and the individual landowners, and/or the guardians of those individuals, whose names and addresses are listed in Exhibit A to the Lease, as "Lessor."

Section 29 of the Lease provides:

*PAYMENTS AND NOTICES*:

All notices, payments and demands shall be sent to either party at the address herein recited or to such place as the parties may hereafter designate in writing. Notices and demands shall be served b[y] certified mail, return receipt requested. The service of any such notice shall be deemed complete within ten (10) days after mailing in any post office within the United States. Copies of all notices and demands shall be sent to the Secretary in care of the office of the Bureau of Indian Affairs, P.O. Box 111, Nespelem, Washington 99155. All notices to Lessor shall be sent to the landowners. The Secretary shall furnish Lessee with the current names and addresses of Lessor upon the request of Lessee.

On January 30, 1985, Evans sent a letter to the BIA, stating, among other things:

In accordance with paragraph three (3) of the subject lease dated February 2, 1984, you are notified by

receipt of this letter that Mar-Lu, Ltd. hereby exer-
cises its option to renew the subject lease for a fur-
ther term of twenty five (25) years to be effective at
the expiration of the original twenty five (25) year
term. This notice extends the total term of subject
lease to February 1, 2034.

The letter was signed by Evans as "General Partner[,] Mar-
Lu, Ltd." As Wapato concedes, Evans's letter was not sent to
the BIA by certified mail, nor was it sent at all to the Land-
owners referred to in Exhibit A to the Lease.

In 2007, after Wapato began efforts to develop a major res-
idential development on MA-8, the Colville Confederated
Tribe (Tribe) questioned whether Evans had effectively exer-
cised his option to renew the Lease. The Tribe sent a letter to
the BIA requesting a meeting to "discuss the current legal sta-
tus of the 25-year extension." In response, the BIA reviewed
the Lease terms and relevant correspondence. The BIA then
sent a letter to the Tribe and Wapato on November 30, 2007,
stating that, in its opinion, the option to renew had not been
exercised effectively by Evans's 1985 letter. The BIA's opin-
ion rested, in part, on Evans's failure to send notice to the
individual Landowners.

As of November 30, 2007, Wapato still had two months left
in which to exercise its option to renew the Lease. Whatever
the deficiencies of Evans's previous efforts, Wapato could
have obviated the issues before us had it taken the steps nec-
essary to do so.

Instead of taking those steps during the remaining exercise
period, Wapato's counsel sent a letter to the BIA on Decem-
ber 18, 2007, contending that the term of the Lease had
already been properly extended and claiming that the BIA had
already acknowledged the extension. Wapato's letter also was
sent to seven Landowners who, Wapato claims, were the only
ones for which it had addresses. Wapato did not request that

the BIA provide it with the "current names and addresses of Lessor," as permitted in Section 29 of the Lease. Wapato's letter was not sent via certified mail to either the BIA or those Landowners for whom it had addresses. When Wapato did not receive a response, it sent another letter to the BIA on January 7, 2008, requesting a response.

On August 7, 2008—by then more than six months after the deadline to exercise the option to renew the term of the Lease—the BIA sent a letter confirming that Evans had not properly exercised his option to renew the Lease. Wapato appealed the BIA's decision, but the Northwest Regional Director of the BIA upheld the agency's decision on October 31, 2008.

On November 21, 2008, after considering the parties' respective arguments, the district court issued an order granting the United States' partial cross-motion for summary judgment in part and denying Wapato's motion for partial summary judgment. The district court subsequently denied Wapato's motion for reconsideration and disposed of the remaining issues in the case.[1] This timely appeal followed.

## STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed de novo. *Travelers Prop. Cas. Co. of Am. v. ConocoPhillips Co.*, 546 F.3d 1142, 1145 (9th Cir. 2008). "We must determine whether, viewing the evidence in the light most favorable to the nonmoving party, any genuine issues of material fact exist, and whether the district court correctly applied the relevant substantive law." *Northrop Grumman Corp. v. Factory Mut. Ins. Co.*, 563 F.3d 777, 783 (9th Cir. 2009) (internal quotation marks omitted).

---

[1]On November 6, 2009, the district court granted the government's motion to dismiss and, in the alternative, motion for summary judgment on the claims related to the 99-year Replacement Lease dispute, discussed in our memorandum disposition.

## DISCUSSION

Wapato argues that there is a genuine issue of material fact as to whether the Landowners are really the Lessor under the Lease, because the Lease is ambiguous. It argues primarily that the BIA did not present at summary judgment a copy of "Exhibit A" to the Lease, which allegedly contained the names and current locations of the Landowners. We disagree with Wapato's arguments.

The BIA is entrusted with managing and protecting Native American interests. *See*, *e.g.*, 25 U.S.C. § 2 ("The Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior . . . have the management of all Indian affairs and of all matters arising out of Indian relations."); *McDonald v. Means*, 309 F.3d 530, 538 (9th Cir. 2002) ("It is well established that the BIA holds a fiduciary relationship to Indian tribes, and its management of tribal [interests] is subject to the same fiduciary duties." (citing *United States v. Mitchell*, 463 U.S. 206, 224-26 (1983))).

Various statutes and regulations govern the form and approval of leases involving Native American lands. Among others, 25 U.S.C. 415(a) requires:

> Any restricted Indian lands, whether tribally, or individually owned, may be leased by the Indian owners, with the approval of the Secretary of the Interior, for public, religious, educational, recreational, residential, or business purposes, including the development or utilization of natural resources in connection with operations under such leases, for grazing purposes, and for those farming purposes which require the making of a substantial investment in the improvement of the land for the production of specialized crops as determined by said Secretary. All leases so granted shall be for a term of not to exceed twenty-five years . . . .

In some limited circumstances, the BIA is authorized to enter into a lease on behalf of Native American owners. *See*, *e.g.*, 25 C.F.R. § 162.2 (1984).[2] Specifically, the Secretary may enter into leases on individually owned land on behalf of:

> (1) Persons who are non compos mentis; (2) Orphaned minors; (3) The undetermined heirs of a decedent's estate; (4) The heirs or devisees to individually owned land who have not been able to agree upon a lease during the three-month period immediately following the date on which a lease may be entered into; provided, that the land is not in use by any of the heirs or devisees; and (5) Indians who have given the Secretary written authority to execute leases on their behalf.

*Id*. The BIA also has responsibility to administer and enforce certain leases. 25 C.F.R. § 162.108.

[1] However, the BIA's obligation to act in furtherance of Native American interests does not mean that the BIA per se assumes their contractual obligations when it acts on their behalf. The Supreme Court addressed this issue in *United States v. Algoma Lumber Co.*, 305 U.S. 415 (1939). There, the Superintendent of the Klamath Indian School, for and on behalf of the Klamath Indians, entered into a timber sale contract with the Algoma Lumber Company, and the Department's Assistant Secretary approved the contract. *Id*. at 419. The Algoma Lumber Company eventually brought suit against the Department for overpayments it claimed to have made to the Superintendent, arguing that the Secretary and Superintendent were the contracting parties. *Id*. at 422. The Supreme Court rejected that argument, stating:

> Neither the United States nor any officer purporting to act on its behalf is named a party to the contract.

---

[2]This regulation is currently found at 25 C.F.R. § 162.601 (2008).

. . . The form of the contract and the procedure pre-
scribed for its execution and approval conform to the
long-established relationship between the govern-
ment and the Indians, under which the government
has plenary power to take appropriate measures to
safeguard the disposal of property of which the Indi-
ans are the substantial owners. Exercise of that
power does not necessarily involve the assumption
of contractual obligations by the government. Their
assumption is not to be presumed in the absence of
any action taken by the government or on its behalf
indicating such a purpose.

*Id.* at 421.

The Court then concluded that all that was done by
[the Secretary and Superintendent] in supervising the
execution of the contracts and their performance was
consistent with the exercise of its function as protec-
tor of the Indians without the assumption by the
United States of any obligation to the purchasers of
the timber, and no implied obligation on its part
arises from the performance of that function.

*Id.* at 422.

**[2]** More recently, the Court of Federal Claims arrived at
a similar conclusion regarding leases for Native American
lands, holding that the BIA's managerial control over allotted
lands does not per se make the BIA a party to contracts
involving those lands. In *McNabb v. United States*, 54 Fed.
Cl. 759, 760 (2002), the plaintiffs had entered into approxi-
mately twenty-two leases with members of the Shoshone-
Bannock tribes in Idaho. The leases were signed by the plain-
tiffs and the Superintendent of the Fort Hall Agency. *Id.* After
a dispute arose over the leases, the court rejected the plain-
tiffs' argument that the government was a contracting party,
notwithstanding statutory and regulatory provisions requiring

government approval of the leases. *Id.* at 772-73. The court concluded that "BIA regulations provide authority for the BIA to act as an approval official rather than as a lessor of Tribal lands." *Id.* at 772; *see also Sangre de Cristo Dev. Co. v. United States*, 932 F.2d 891, 895 (10th Cir. 1991) ("[T]he United States is not liable to third parties when it contracts with them on behalf of Indian tribes."); *Saguaro Chevrolet, Inc. v. United States*, 77 Fed. Cl. 572, 581 (2007) (rejecting the plaintiff's argument that regulations and a lease agreement imposed landlord obligations on the United States).

**[3]** In support of its argument that the BIA was the Lessor of the Lease, Wapato argues that the BIA was authorized to sign, and did sign, the Lease for all of the Landowners. Wapato is mistaken concerning the BIA's role in the transaction.

**[4]** By its terms, the Lease was executed in conformity with 25 U.S.C. § 415 and Part 162 of the implementing regulations. Those statutory and regulatory provisions authorize an approval role for the BIA concerning Leases signed with Native Americans, but do not authorize the BIA to enter into a contract with Wapato or its predecessors-in-interest on behalf of the government. *See* 25 U.S.C. § 415(a) ("Any restricted Indian lands, whether tribally, or individually owned, may be leased by the Indian owners, *with the approval of the Secretary of the Interior . . . .*" (emphasis added))); 25 C.F.R. § 162.2 (specifying narrow circumstances in which the BIA can grant lease *on behalf of* Native American landowners).

**[5]** Here, the BIA approved the Lease and executed it on behalf of all the Landowners, consistent with its delegated authority. Approximately 64% of the Landowners personally consented to the Lease, having signed "Statement of Awareness" forms. The BIA therefore signed for those Landowners pursuant to their express authorization under 25 C.F.R. § 162.2(a)(5). The BIA also executed the Lease on behalf of

a minority of the allottees (i.e., the 36% who did not sign) by the limited authority of § 162.2(a)(4). However, in exercising its authority pursuant to § 162.2(a)(4), the BIA was not transmogrified into a Lessor. Neither did the BIA become a party to the Lease by acting in its approval capacity or in its limited role as proxy for the 64% of the Landlords who had given their express authority to sign on their behalf, or with respect to the remaining 36% of the Landowners, for whom it signed as authorized by § 162.2(a)(4).

Wapato also contends that the Lease is ambiguous. We consider this contention by first observing that the parties agree that federal contract law applies to the Lease, and that the district court applied federal law, citing *United States v. Seckinger*, 397 U.S. 203, 209-10 (1970). We also apply federal law because the BIA's role and obligations under the contract are in contention. *See Smith v. Cent. Ariz. Water Conservation Dist.*, 418 F.3d 1028, 1034 (9th Cir. 2005) ("[W]e have recognized limited circumstances in which state law may apply to the interpretation of a federal contract, such as when the United States is not a party, or when the direct interests and obligations of the government are not in question.").

Well-known principles of contract law guide us in the proper construction of federal contracts. *Saavedra v. Donovan*, 700 F.2d 496, 498 (9th Cir. 1983) (citing *Seckinger*, 397 U.S. at 209-11). "A written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999). "Contract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself." *Id*. The fact that parties to a contract dispute its meaning does not, ipso facto, mean that the contract is ambiguous; a contract is only ambiguous if reasonable people could find its terms susceptible to more than one interpretation. *Kenne-*

*wick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989).

**[6]** Here, the Lease is not ambiguous. The terms of the Lease do not admit of a construction whereby the BIA could be the Lessor. The Lease explicitly defines the individual Landowners as the "Lessor" and separately defines the Secretary. Moreover, Section 29 of the Lease requires that: "Copies of all notices and demands shall be sent to the Secretary in care of the office of the Bureau of Indian Affairs . . . . All notices to Lessor shall be sent to the landowners. The Secretary shall furnish Lessee with the current names and addresses of Lessor upon the request of Lessee." Thus, it is clear that all "notices and demands" must be sent *both* to the Secretary and to the Landowners. Moreover, how could the Secretary provide Lessee with the "current names and addresses of Lessor" if the Secretary were the Lessor? Finally, the Lease definitions and subsequent provisions do not use "Secretary" and "Lessor" interchangeably. If these were the same party, it would make no sense for the Lease to distinguish between them.

**[7]** In light of the above considerations, we hold that the Lease is not ambiguous and that the BIA was not the Lessor.[3] Because the BIA was not the Lessor, the Lease terms required that Wapato notify the BIA and the Landowners directly via certified mail, which it did not do. *See* Williston on Contracts § 46:12 (4th ed. 2010) ("[T]he party giving the option is protected only by the condition that the optionee can only exer-

---

[3]In holding that the Lease is unambiguous, we also reject Wapato's arguments, raised for the first time in its motion for reconsideration, that the Lease is also ambiguous concerning whether the BIA could unilaterally modify the Lease or accept notice on behalf of the Landowners. There is no evidence in the record that, after the Lease was signed, the BIA had authority from the Landowners to either modify the terms of the Lease, or to accept notice. The district court did not abuse its discretion in denying the motion for reconsideration. *MacDonald v. Grace Church Seattle*, 457 F.3d 1079, 1081 (9th Cir. 2006).

cise it strictly in accordance with its terms."). Moreover, there is no evidence in the record that the Lessee requested that the BIA furnish it with the current names and addresses of the Landowners, as it was permitted to do under Section 29 of the Lease.[4] Accordingly, we hold that Wapato's option to renew the Lease was not effectively exercised by Evans, or later by Wapato, and that the Lease terminated upon the last day of its 25-year term.

## CONCLUSION

For the foregoing reasons, we affirm the district court.

**AFFIRMED.**

---

[4]In 2005, Wapato requested the names and addresses from the Agency for the purpose of sending the 99-Year Replacement Lease, not for the purpose of exercising its option to renew the Lease. The Acting Superintendent of the Agency, Gene Nicholson, rejected this request and, instead, indicated that he would forward the correspondence to the Landowners.