# United States Court of Appeals for the Federal Circuit

_____

**VERNON MOODY, ANITA MOODY,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

_____

2018-2227

_____

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00107-EJD, Senior Judge Edward J. Damich.

_____

Decided: July 24, 2019

_____

TERRY LEE PECHOTA, Pechota Law Office, Rapid City, SD, argued for plaintiffs-appellants.

ANN MOTTO, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by MARGARET JANTZEN, JOSEPH H. HUNT, TARA K. HOGAN, ROBERT EDWARD KIRSCHMAN, JR.

_____

Before DYK, CHEN, and STOLL, *Circuit Judges.*

DYK, *Circuit Judge.*

Vernon and Anita Moody sued the United States in the Court of Federal Claims ("Claims Court") alleging that the United States was a party to contracts with the Moodys and breached these contracts.[1] The Moodys also contended that they had implied-in-fact contracts with the United States, and that the United States committed an uncompensated takings under the Fifth Amendment. The Claims Court dismissed the complaint. It concluded that the United States was not a party to the contracts. The Claims Court also concluded that the Moodys failed to state a claim upon which relief could be granted as to the alleged implied-in-fact contracts with the United States, and that there was no cognizable takings claim. We affirm.

## BACKGROUND

The Moodys leased various parcels on the Pine Ridge Indian Reservation in South Dakota for agricultural use. The question is whether the United States was a party to those contracts.

"[T]he United States has a trust responsibility to protect, conserve, utilize, and manage Indian agricultural lands consistent with its fiduciary obligation and its unique relationship with Indian tribes." 25 U.S.C. § 3701(2). To carry out this trust responsibility "the Secretary [of the Interior is authorized] to take part in the management of Indian agricultural lands, with the participation of the beneficial owners of the land, in a manner consistent with the trust responsibility of the Secretary and with the objectives of the beneficial owners." 25 U.S.C. § 3702(2). The Secretary has delegated some of these responsibilities to

---

[1]    For convenience, this opinion treats the leases as being entered into by both of the Moodys, though all the leases were, in fact, entered into either by Vernon Moody or Anita Moody, not both.

the Bureau of Indian Affairs ("BIA"), within the Department of the Interior, which has promulgated regulations governing agricultural leases on Indian lands. *See* 25 C.F.R. §§ 162.101–.256. These regulations generally allow Indian landowners to enter into such agricultural leases with the approval of the BIA. The BIA is also involved in the enforcement of the lease provisions. *See id.* §§ 162.247–.256.

In 2011, the Moodys entered into five-year leases with respect to the parcels of land in question. The leases contain similar, albeit not identical, language. Each lease defined "the Indian or Indians" as the "LESSOR" and the Moodys as "LESSEE." *See* J.A. 18, 32, 35, 47, 61. Although the documentary record is not entirely clear, the Claims Court concluded that "[t]he Oglala Sioux Tribe was a signatory to all five leases." J.A. 2. No party disputes this on appeal.[2] The leases stated that "the Secretary of the Interior [was] acting for and on behalf of Indians," and that the land being leased was "lands and interest(s) held in trust or restricted status by the United States for the benefit of an Indian Tribe." *See, e.g.*, J.A. 18. Other provisions of the leases further distinguished between the parties to the lease and the Secretary of the Interior/United States.[3]

---

[2]    At oral argument the Moodys agreed. Oral Arg. at 2:11–36 ("Q. [I]t is quite clear that the other party is the Oglala Sioux . . . A. Okay. I agree with that . . . .").

[3]    *See, e.g.*, J.A. 19 ("Any [change to the lease] may be made only with the approval of the Secretary and the written consent of the parties to the lease . . . ."); *id.* ("[The LESSEE] shall not destroy or permit to be destroyed any trees, except with the consent of the LESSOR and the approval of the Secretary . . . ."); *id.* ("The owners of the land and the LESSEE shall be notified by the Secretary of any . . . change in the [trust] status of the land."); J.A. 20 ("Neither the LESSOR, nor the United States . . . .").

Issues with respect to lease payments arose in 2012. The Moodys' amended complaint alleged the following, which we must accept as true for purposes of this appeal. The Moodys visited the BIA Pine Ridge Agency of Interior to determine the amount they owed on the leases. They delivered a personal check for the proper amount to the BIA, J.A. 93 ¶ 16, but the BIA subsequently returned the check and demanded that the payment be made by cashier's check, J.A. 93 ¶ 18. The BIA then sent letters to the Moodys, which "serve[d] as [the Moodys'] official notification that effective April 18, 2013, [four of the leases were] hereby cancelled for non-compliance" for failure "to submit bonding, and payment" as to Lease Nos. 1-0218-11-15 and 1-T561-11-15, J.A. 76, 78, and "for failure to submit bonding, Crop Insurance for 2012," "any crop reports," and "Negotiable Warehouse Receipts" for Lease Nos. 1-Unit5-11-15 and 1-UNT19-11-15, J.A. 80–81. J.A. 3; J.A. 93 ¶ 19. The letters also noted that the Moodys could appeal the decision to the BIA's "Regional Director . . . in accordance with the regulations in 25 CFR Part 2," and that the "notice of appeal must be filed in this office within 30 days of the date [the Moodys] receive this decision." J.A. 78. The letters further specified that "[i]f no appeal is timely filed, this decision will become final for the Department of Interior at the expiration of the appeal." J.A. 79. "No extension of time may be granted for filing a notice of appeal" and "[i]f [the Moodys] should require further assistance in this matter, [they] may contact the Branch of Realty." J.A. 79.

Within the 30-day appeal period, the Moodys went back to the BIA with a cashier's check in the proper amount, which the BIA accepted. J.A. 93 ¶¶ 19–20. The BIA also informed the Moodys that they did not need to appeal, could continue farming the land according to the leases, and did not require written confirmation. J.A. 93 ¶ 20. Subsequently, on June 3, the Moodys received trespass notices, which led them to once again return to the BIA to resolve the issue. J.A. 93–94 ¶¶ 22–24. For a second

time they were instructed that they "should continue to farm." J.A. 94 ¶¶ 23, 24. But, a short time later, they were instructed to vacate the land, which they did. J.A. 94 ¶ 25. On July 9, 2013, the Moodys received a cancellation letter "for failure to submit bonding, all crop reports and 'negotiable Warehouse receipts'" for the fifth lease, Lease No. 1-T367B-12-16, J.A. 83. *Accord* J.A. 3; J.A. 94 ¶ 26.

Based on the allegations in the complaint, it appears that the Moodys would have had good grounds to appeal the lease terminations with the BIA. After there is a cancellation decision on an agricultural lease, the tenant has 30 days from receiving the cancellation letter to appeal the decision. 25 C.F.R. § 162.254. The cancellation will typically remain ineffective during the time that tenant's appellate rights are being exhausted. *Id.* §§ 2.6(a), 162.254. For cancellation of agricultural leases, the appeal is first filed with the Area Director and thereafter with the Interior Board of Indian Appeals. *Id.* §§ 2.4(a), (e), 2.20.

The Board reviews questions of law and the sufficiency of the evidence de novo, *Early S. Burley v. Acting S. Plains Reg'l Dir.*, 64 IBIA 162, 167, 2017 WL 2415322, at *5 (IBIA 2017), but will not substitute its own judgment for the BIA official's if the matter is committed to the BIA's discretion and is otherwise consistent with law, *Barber v. W. Reg'l Dir.*, 42 IBIA 264, 266, 2006 WL 1148723, at *2 (IBIA 2006). The appellant bears the burden of showing error with the decision below. *Guerrero v. Nw. Reg'l Dir.*, 63 IBIA 346, 350, 2016 WL 5335850, at *3 (IBIA 2016) (citing 43 C.F.R. § 4.322(a)). Generally, after the exhaustion of administrative remedies, *see* 25 C.F.R. §§ 2.1–2.21; 43 C.F.R. § 4.331, the BIA's final agency decision is subject to challenge in district court under the Administrative Procedure Act, 5 U.S.C. § 704.

The Moodys did not file an appeal with the BIA for the cancellation of any of the leases. Instead, in 2016, the Moodys filed a complaint against the United States in the

Claims Court seeking more than $1.5 million in damages. They asserted three main theories of liability. First, they contended that the United States was a party to the leases and had breached the leases. Second, they contended that even if the United States was not a party to the original leases, the United States agreed to revive the leases thereby creating implied-in-fact contracts with the United States, which were breached by the United States. Third, the Moodys contended that the United States committed an uncompensated takings under the Fifth Amendment when the BIA cancelled the leases, informed the Moodys to continue farming, and then ultimately removed the Moodys.

The Claims Court dismissed the written contract claims for lack of jurisdiction because the United States was not a party to the leases, for failure to state a claim upon which relief could be granted because the Moodys did not have implied-in-fact contracts with the government, and for failure to raise a legally cognizable takings claim because their claim was based on the government's alleged violation of applicable regulations.

The Moodys appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3). We review dismissal of a complaint for lack or jurisdiction and failure to state a claim de novo. *See Turping v. United States*, 913 F.3d 1060, 1064 (Fed. Cir. 2019).

DISCUSSION

We reject each of the Moodys' three arguments as to why the United States is liable for damages arising from the cancellation of the leases.[4]

---

[4]    The Moodys argue that they should be able to recover in quantum meruit, but we conclude that the Claims

First, the Moodys contend that, even though the tribe was a party to the leases, the United States was also a party to the leases. Unless the United States is a party to the contracts, there is no privity of contract between the United States and the Moodys and thus no jurisdiction in the Claims Court under the Tucker Act for this claim. *See Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998). The theory that the United States is a party to the leases is contrary to the express contractual language, which distinguished between the Secretary/United States "acting for and on behalf of" the Indian landowners and the parties to the lease—the Oglala Sioux Tribe as the "LESSOR" and the Moodys as the "LESSEE."

In *United States v. Algoma Lumber Co.*, 305 U.S. 415 (1939), the Supreme Court held that the United States' entry into leases on behalf of an Indian landowning tribe and exercise of its trust responsibilities to Indian beneficial landowners "does not necessarily involve the assumption of contractual obligations" "in the absence of any action taken by the government or on its behalf indicating such a purpose." *Id.* at 421. "The *Algoma* opinion represents the Court's rejection of the trust theory of liability as a means of holding the United States contractually liable to third parties when it acts on behalf of Indians." *Sangre de Cristo Dev. Co. v. United States*, 932 F.2d 891, 895–96 (10th Cir. 1991). Here, there are no alleged facts that would support a conclusion that the United States was acting as anything other than a trustee when approving and managing the leases. Under *Algoma*, the allegations of the complaint are legally insufficient to support a conclusion that the United States was a party to the leases.

In *Wapato Heritage, L.L.C. v. United States*, 637 F.3d 1033 (9th Cir. 2011), the Ninth Circuit rejected a similar

---

Court properly found that the Moodys did not plead such a claim in their complaint.

argument and concluded that the United States was not the "lessor" in a lease between members of an Indian tribe and the plaintiff. Based on *Algoma*, the Ninth Circuit noted that "the BIA's obligation to act in furtherance of Native American interests does not mean that the BIA per se assumes their contractual obligations when it acts on their behalf." *Id.* at 1037. Although the applicable regulations "authorize an approval role for the BIA concerning [l]eases signed with Native Americans, [they] do not authorize the BIA to enter into a contract with [the plaintiff] . . . on behalf of the government." *Id.* at 1038–39. The court also found that the contract language unambiguously showed that the BIA was not the lessor, as "[t]he [l]ease explicitly define[d] the individual Landowners as the 'Lessor' and separately define[d] the Secretary" and treated the two as separate parties. *Id.* at 1039–40. We have the same situation here where the BIA's alleged acts were all made pursuant to its trust responsibilities to the tribe, and the contract clearly distinguishes between the parties to the contract, LESSOR and LESSEE, and the Secretary/United States. *See also Sangre de Cristo*, 932 F.2d at 895–96.

The Moodys contend that *Algoma* and related cases are inconsistent with the Restatement (Second) of Trusts, which recognized that "the trustee is subject to personal liability upon contracts made by him in the course of the administration of the trust." Restatement (Second) of Trusts § 262 (Am. Law. Inst. 1959). To be sure, the Supreme Court has looked to the Restatement when evaluating the trust relationship between the United States and the Indians, s*ee White Mountain Apache Tribe v. United States*, 249 F.3d 1364, 1377–78 (Fed. Cir. 2001) (collecting Supreme Court cases), *aff'd*, 537 U.S. 465 (2003). But even if the Restatement (Second) of Trusts could be read as making the trustee a party to the contract, the Restatement (Third) of Trusts reflects a change in the law. Now it is recognized that, in general, a trustee is not personally liable for contracts entered into for the benefit of the trust. Section 106

states that "[a] trustee is personally liable . . . on a contract entered into in the course of a trust administration <u>only if</u> [(1) it constituted a breach of the trust, (2) the trustee's representative capacity was undisclosed, or (3) the contract otherwise provides]." Restatement (Third) Trusts § 106 (Am. Law. Inst. 2012) (emphasis added).[5] None of these circumstances is alleged to be present here.

This approach is also consistent with the Restatement (Third) of Agency § 6.01 (Am. Law Inst. 2006) ("[w]hen an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal . . . <u>the agent is not a party to the contract</u> unless the agent and third party agree otherwise" (emphasis added)), the Uniform Probate Code § 7-306(a) ("[u]nless otherwise provided in the contract, a trustee is not personally liable on contracts properly entered into in his fiduciary capacity in the course of administration of the trust estate unless he fails to reveal his representative capacity and identify the trust estate in the contract"), and the Uniform Trust Code § 1010(a) ("[e]xcept as otherwise provided in the contract, a trustee is not personally liable on a contract properly entered into in the trustee's fiduciary capacity in the course of administering the trust if the trustee in the contract disclosed the fiduciary capacity").

Given the Supreme Court's decision in *Algoma* and the state of general trust law, we see no basis for concluding that the United States became a party to the contract and waived its sovereign immunity by approving and acting for

---

[5]    *See* 4 Austin Wakeman Scott, William Franklin Fratcher & Mark L. Ascher, Scott & Ascher on Trusts § 26.2 (4th ed. 2007) ("[T]here is now a substantial body of authority . . . that a trustee who has signed a contract in a representative capacity is . . . not personally [liable].").

the benefit of the Indian or Indians with respect to the leases.

Second, the Moodys contend that there were implied-in-fact agreements created between the Moodys and the United States when the BIA told the Moodys (twice) to continue farming the lands after sending the cancellation letters. The BIA does not have general authority to lease land held for the benefit of a tribe unless it receives direct authorization from the tribe. *See* 25 C.F.R. § 162.207(a) ("Tribes grant leases . . . subject to [BIA's] approval."); *id.* § 162.209 (identifying limited circumstances, not applicable here, where the BIA can grant an agricultural lease without direct authorization). Such direct authorization was satisfied here by the tribal signature on the original leases. It is difficult to see how the United States, without specific authorization, could enter into an implied-in-fact contract with the Moodys on behalf of the tribe. The Moodys' only response to this issue appears to be that the earlier cancelled leases, which were signed by the Tribe, were revived by the BIA's oral representations and thus did not require new tribal authorization. The Moodys do not present any salient legal support for their position that the BIA can revive a cancelled lease without tribal authorization. Even if such authority did exist, as the Moodys recognize, the effect would merely be that "[t]here were originally written leases that were terminated but then orally revived on the same terms as in the previous written leases." Moody Br. at 23. As discussed above, the United States was not a party to the original leases, and thus would also not be a party to the implied-in-fact contracts revived with the same terms. We agree with the Claims Court that the Moodys' implied-in-fact contract claim does not constitute a claim upon which relief can be granted.

Third, the Moodys contend that the United States effectuated an uncompensated takings when it evicted the Moodys after the BIA had informed them to continue to farm the land despite the earlier cancellation letters. In

their amended complaint, the Moodys claimed that they "and their property were removed, <u>contrary to applicable regulations</u>, from the leases and plaintiffs were deprived of monies expended to plant and sow the crops and the profits from any harvest." J.A. 95 (emphasis added); *see* J.A. 91 ("This is an action by plaintiffs against defendant for <u>unlawful</u> termination and breach of lease agreements . . . ." (emphasis added)).

A takings claim cannot be found on the theory that the United States has taken unlawful action. "[A]n uncompensated taking and an unlawful government action constitute two separate wrongs that give rise to two separate causes of action." *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1331 (Fed. Cir. 2006). "[C]omplaints about the wrongfulness of the [government action] are therefore not properly presented in the context of [a] takings claim." *Rith Energy, Inc. v. United States*, 270 F.3d 1347, 1352 (Fed. Cir. 2001) (on petition for rehearing). "[T]o the extent that [a] plaintiff claims it is entitled to prevail *because* the agency acted in violation of statute or regulation, [our decisions do] not give the plaintiff a right to litigate that issue in a takings action rather than in the congressionally mandated administrative review proceeding." *Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1369 (Fed. Cir. 2005) (emphasis and first and third alterations in original) (quoting *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1366 (Fed. Cir. 2001)). Thus, "a claim premised on a regulatory violation does not state a claim for a taking." *Id*. The theory that the Moodys were harmed by the BIA's violation of regulations does not give rise to a takings claim but rather the right to appeal the lease cancellations through the administrative process at the BIA, an action that the Moodys did not take. The Moodys argue on appeal that their allegation in the complaint that the BIA's actions were "contrary to applicable regulations," J.A. 95, should be ignored, but even without that clause, the Moodys' argument rests on the same theory. Namely, the theory that the BIA's actions

were contrary to law, which, as discussed above, cannot be the basis of a takings claim. We therefore see no reversible error with the Claims Court's decision dismissing the takings claim.

We express no opinion as to whether the Moodys now have an administrative remedy or whether the limits for seeking such relief should be equitably tolled. *See Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990) ("We have allowed equitable tolling . . . where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass.").

## AFFIRMED

### COSTS

No costs.